IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHARLES ARMOUR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   19-cv-678-RJD |
| | ) | |
| DR. VENERIO SANTOS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

**DALY, Magistrate Judge:**

Plaintiff Charles Armour, formerly incarcerated within the Illinois Department of Corrections ("IDOC"), filed this action pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act, 42 U.S.C. §§12101-213 ("ADA") and Rehabilitation Act, 29 U.S.C. §§ 29 U.S.C. §794 ("RA").   Plaintiff alleges that he suffers from chronic lower back pain, degenerative disc disease, seizure/convulsive muscle spasms,   fibromyalgia, and, as a result, is confined to a wheelchair.   Plaintiff alleges he was not provided adequate medical care for his conditions at Centralia Correctional Center ("Centralia").   Plaintiff also claims that he was not provided certain assistive devices, such as a wheelchair with removable arms, or otherwise provided appropriate accommodations at Centralia.

After the Court conducted a threshold review pursuant to 28 U.S.C. § 1915A and the issue of administrative remedy exhaustion was resolved, Plaintiff's case proceeded on the following claims:

> Count One:   Dr. Venerio Santos, Dr. Arnel Garcia, Lisa Krebs, and Jessica Kneleb were deliberately indifferent under the Eighth Amendment to Plaintiff's spinal condition.

Page **1** of **29**

Count Two:    Deana Shoemaker, Terry Dean, and Beverly Habbe were deliberately indifferent under the Eighth Amendment to Plaintiff's spinal condition.

Count Four:   Violation of the Americans with Disabilities Act and/or the Rehabilitation Act for failing to accommodate Plaintiff's medical needs.  This claim is brought against Rob Jeffreys in his official capacity.

Count Five:   Robert Mueller and David Stock were deliberately indifferent under the Eighth Amendment to Plaintiff's serious medical needs by not providing him with adequate access to showers and failing to refer him to an emergency room.

Count Six:    Correctional Officer Jason Zurliene was deliberately indifferent under the Eighth Amendment to Plaintiff's serious medical needs when he failed to provide Plaintiff with medical attention for a medical emergency.

Defendants Dean, Garcia, Habbe, Kneleb, Santos, and Shoemaker are/were all employed by Wexford Health Sources, Inc., a company that contracts with the Illinois Department of Corrections to provide health care to inmates in Illinois.   Pending before the Court is the Wexford Defendants' summary judgment motion (Docs. 259 and 260), to which Plaintiff responded (Doc. 275) and Defendants filed a Reply (Doc. 280).

Defendants Jeffreys, Krebs, Stock, and Zurliene are all employed by the Illinois Department of Corrections.   They also filed a summary judgment motion (Docs. 263 and 264), to which Plaintiff responded (Doc. 276).

## **Material Facts**

Plaintiff arrived at Centralia Correctional Center ("Centralia") from Western Illinois Correctional Center on June 6, 2016.   Doc. 260-1, p. 5.   His medical history reflected that he had chronic back pain, hepatitis C, and had undergone cervical spinal fusion surgery.   Doc. 260-2, p.

19.   Upon arrival at Centralia, Plaintiff saw a nurse who noted that he should be "evaluate[d] for seizure."   *Id*., p. 21.

At all relevant times, Dr. Venerio Santos was the Medical Director at Centralia.   *Id*., p. 12. Plaintiff saw Dr. Santos for the first time on June 10, 2016.   Doc. 260-1, p. 6.   Plaintiff complained of "spasm in legs with back pain" and denied "seizure activities."   Doc. 260-2, p. 25. In the "Objective" portion of his notes, Dr. Santos wrote "ambulates with cane, slight weakness both lower extremities, tender [lower back]."   *Id*.   pp. 25-26.   Dr. Santos issued Plaintiff one-year permits for 'low bunk, slow walk, and cane for ambulation."   *Id*., p. 27.   Approximately two weeks later, Dr. Santos also admitted Plaintiff to stay in the infirmary.   *Id*., pp. 31-33.   Inmates with chronic (but stable) physical and medical conditions may reside in the infirmary at Centralia where they have 24-hour access to a nurse. *Id*., p. 32.

Dr. Santos reviewed Plaintiff's prior medical records to see if there were any magnetic resonance imaging reports from studies performed on Plaintiff's lower back and if so, whether his sciatic nerve was impinged.   *Id*., p. 35.   Impingement on the sciatic nerve causes weakness in the legs.   *Id*., p. 36.   Dr. Santos found that at one of Plaintiff's prior facilities, Plaintiff underwent an MRI that did not show pressure on the sciatic nerve.   *Id*.

While reviewing Plaintiff's records, Dr. Santos saw that Plaintiff received narcotic pain medication while previously incarcerated at a federal penitentiary.   *Id*., p. 38.   Dr. Santos did not want to prescribe narcotic pain medications to Plaintiff "unless it's really, really necessary." *Id*., p. 38.   Dr. Santos testified that he never prescribed narcotic pain medications or referred Plaintiff to a neurologist because his June 2016 examinations revealed that Plaintiff had no sensory or motor deficits.   *Id*., pp. 38, 87-88, 91, 109.   Over time, Plaintiff resisted Dr. Santos'

examinations and recommendations for back exercises (according to Dr. Santos). *Id*., pp. 38-39, 41-43, 72-73. Dr. Santos also testified that starting a few months after Plaintiff arrived at Centralia, he refused to ambulate-even with a walker. *Id*., pp. 40-41, p. 80-82, 100-103. Also, Dr. Santos would not refer Plaintiff to a neurologist or other specialist without Plaintiff first completing a physical therapy evaluation. *Id*., pp. 189-90. Plaintiff ultimately presented twice for a physical therapy evaluation, but because of spasms did not complete the evaluations. *Id*. Dr. Santos believed that Plaintiff exaggerated those spasms. *Id*.

On July 28, 2016, a nurse in the infirmary noted that Plaintiff had "uncontrollable shaking of the lower extremities. Unable to stop. Crying. Laying on right side. Reports pain." Doc. 260-1, p. 10. Dr. Santos was not present at the prison, but the nurse called him and he ordered Ativan to "calm [Plaintiff] down." Doc. 260-2, p. 67. On August 2, 2016, a nurse noted at 7:20 a.m. that Plaintiff told her, "I'm having severe shaking can't stand up or my legs go out." Doc. 260-1, p. 10. Dr. Santos saw Plaintiff ten minutes later and observed that he was not shaking. Doc. 260-2, p. 68. A nurse observed Plaintiff having body tremors/spasms again on August 4, 2016, and the nurse noted that he said, "I need my pain medicine that's why this is happening. Morphine and Vicodin!" Doc. 260-1, p. 11. Plaintiff further reported that he had "gone to the bathroom" on himself and needed a shower. *Id*. Upon learning of this incident, Dr. Santos felt Plaintiff was exhibiting drug-seeking behavior. *Id*., p. 71.

Nurse Beverly Habbe made a five-page note in Plaintiff's records on October 21, 2016. *Id*., p. 12-16. Her assessment was that Plaintiff was exhibiting "suspected manipulative behavior." *Id*., p. 16. Nurse Habbe reviewed the note at her deposition and testified regarding the incident, explaining that "[w]hat made it suspicious was the fact that he could—would stop to

talk or to look around and see if people were watching and then continue."   Doc. 260-3, p. 97.
Nurse Habbe's note mentions that Plaintiff was behaving normally until Dr. Caldwell (a physician
covering for Dr. Santos while on vacation) appeared.   *Id.*, p. 95; Doc. 260-1, p. 12.   Dr. Caldwell
began to examine a patient "directly across from Mr. Armour" and Mr. Armour got into his
wheelchair and "rolled into the bathroom."   Doc. 260-3, p. 95.   The emergency light came on for
the bathroom, and Mr. Armour started "wailing loudly."   Doc. 260-1, p. 13.   He instructed an
orderly to carry him back to bed, and as the orderly was doing so, Mr. Armour paused his moaning
to tell Dr. Caldwell "this is from my back pain, Doc, that's what causes this!"   *Id.*   The orderlies
laid Plaintiff in bed with the rails elevated.   Doc. 260-3, p. 98.

In November 2016, Plaintiff received a walker.   Doc. 260-2, p. 80.   Dr. Santos testified
that Plaintiff continued to use a wheelchair, but Dr. Santos believed that Plaintiff had movement
in his legs and it was "better for him to be walking with his legs rather than sitting in a wheelchair."
*Id.*   Plaintiff did not have his own wheelchair, but used one that was available in the infirmary.
*Id.*

Dr. Garcia saw Plaintiff multiple times in November 2016.   Doc. 260-4, pp. 52, 53.   Dr.
Garcia recalls that Plaintiff complained of low back pain and Dr. Garcia told him to continue taking
Ibuprofen.   *Id.*   Dr. Garcia saw Plaintiff again in April 2017 for complaints of low back pain;   he
reviewed Plaintiff's MRI taken prior to coming to Centralia, and told Plaintiff "you have a chronic
problem in your back…and that's not going away."   *Id.*, p. 53.   Plaintiff asked Dr. Garcia to
prescribe Robaxin (a muscle relaxant) to him, and Dr. Garcia agreed.   *Id.*, p. 54.

In December 2016, Plaintiff started wearing a gait belt so that if he started to fall while
using the walker, "he would be pulled up immediately" by an orderly or nurse.   Doc. 260-2, p. 85.

According to notes made by the nursing staff, however, Plaintiff continued refusing to ambulate, even with assistance by the staff and orderlies.   *Id*., pp. 99, 101-107.   Dr. Santos' notes reflect that Plaintiff was "advised on effect of immobility" and encouraged to exercise.   *Id*., p. 106.

Plaintiff recalls that in December 2016, Nurse Terri Dean placed a gait belt on him "in a very aggressive manner" and Plaintiff told her that she was hurting him.   Doc. 275-4, p. 11.   She told him to "shut up" and "tr[ied] to place [him] up on the walker" but the "walker went flying down the hallway. " *Id*.   Nurse Dean and a Correctional Officer "laughed …like they were really enjoying" the incident.   *Id*.

Lisa Krebs was the healthcare unit administrator at Centralia until March 2017.   Doc. 264-2, p. 9.   She responded to a grievance Plaintiff submitted in December 2016 in which he asked to be able to use "his own wheelchair with removable arms" because it was difficult for him to transfer from the infirmary's wheelchair into bed, the toilet, and the shower chair.   Doc. 276-6, p. 1.   In her response to the grievance, Ms. Krebs noted that Plaintiff "has been witnessed up and around in his room and up at the bedside.   The HCU has a wheelchair to assist with long distance movement.   [Plaintiff] is not dependent on a wheelchair."   *Id*.   Plaintiff recalls that the healthcare unit's wheelchair was not safe because the "front wheel races" were gone and the wheels would wobble and lock.   Doc. 275-4, p. 12.   Upon receiving Plaintiff's complaints, Ms. Krebs reviewed Plaintiff's medical records to "make sure…treatment was provided."   Doc. 264-2, p. 37.

Ms. Krebs and Warden Mueller met with Plaintiff in December 2016 to discuss his medical treatment, his wheelchair, and the shower chair.   Doc. 264-1, p. 41.   Plaintiff subsequently fell twice from the shower chair.   *Id*., p. 38.   Ms. Krebs recalls inspecting the shower chair after

Page **6** of **29**

Plaintiff fell and she did not see any defects.  Doc. 264-2, p. 92.  As the healthcare unit administrator, she periodically checked the condition of the shower chair.  *Id*.  Ms. Krebs and Warden Mueller told Plaintiff to continue following Dr. Santos' orders and recommendations. Doc. 275-4, p. 13.

In April 2017,  Dr. Santos ordered an exercise band for Plaintiff to use to keep his feet from contracting.  Doc. 260-2., p. 108.  Plaintiff requested physical therapy; Dr. Santos submitted a request to collegial review, and it was approved.[1]  *Id*., p. 115.  Plaintiff was sent to St. Mary's Hospital in Centralia for physical therapy in May, but ultimately was evaluated in the St. Mary's hospital emergency department for uncontrolled spasms.  Doc. 275-2, p. 1. According to the hospital's records, Plaintiff told hospital staff that "the spasms happen a lot and he needs Ativan and Dilaudid."  Doc. 260-1, p. 65.  Dilaudid is an opioid medication.[2]  Plaintiff received a dose of Dilaudid in the emergency room.  Doc. 260-2, p. 261.  When Plaintiff returned to Centralia that day, Dr. Santos noted "refus[ing] to follow physical therapy intervention" but was observed using his lower extremities to get out of the wheelchair.  *Id*., p. 121-22.

Dr. Santos sent Plaintiff for another physical therapy evaluation in July 2017 because Plaintiff "was demanding all those drug substances and all these privileges that we were not supposed to give to him."  *Id*., p. 127.  The physical therapist noted that Plaintiff would not put his feet on the ground and therefore could not be evaluated.  *Id*., p. 190.  The physical therapist also called Dr. Santos and told him that plaintiff had refused to be examined and "faked [a]

---

[1]  "Collegial" is approval from Wexford for a treatment or service.   Doc. 260-2, pp. 109, 130.
[2]  dea.gov/factsheets/hydromorphone *(last accessed October 19, 2023).*

seizure."[3]   Doc. 260-2, p. 117.

In July 2017, a staff member noted in Plaintiff's chart that, following a loud crashing noise, Plaintiff was "found lying on left side of shower floor screaming incoherently."   *Id.*, p. 134.   Dr. Santos was not present, but gave a telephone order to offer Plaintiff Motrin, lay him in bed, and give him a cold pack.   *Id.*, p. 134-35.   Plaintiff recalls that the "arm gave out on the shower chair causing me to fall out of the shower chair" and he hit his head, creating a "soccer size hole" in the ceramic tile.   Doc. 275-4, p. 26.

Also in July 2017, Dr. Santos noted that Plaintiff's left foot was "a little twisted..a little deformed."   *Id.*, p. 138.   Dr. Santos told Plaintiff that "when there's not much movement of the joint…it will become contracted." *Id.*, p. 139.   Dr. Santos ordered a muscle relaxant for Plaintiff, and also told him to continue the exercise program and try to ambulate with the walker three times a day.   *Id.*, p. 140.

According to the nurses' notes, Plaintiff continued to have "episodes of muscular spasm." *Id.*, pp. 141-145.   These episodes never occurred when Dr. Santos was at Centralia.   *Id.*   The nurses would call Dr. Santos and ask if they could give him Ativan, so Dr. Santos gave a standing order that if Plaintiff had an episode of "severe spasm" he could receive an Ativan[4] injection.   *Id.*, p. 144.   Dr. Santos did not believe that Plaintiff was really having spasms, but the nurses would "panic" and so Dr. Santos agreed that they could "just give him Ativan because that was what he

---

[3]  The Court considers the physical therapist's statement on the phone to Dr. Santos not for the truth of the matter asserted, but to show its effect on the listener; namely, that Dr. Santos did not consider additional referrals for Plaintiff based in part on this statement by the physical therapist.   Fed. R. Evid. 801(c)(2).   For purposes of ruling on this summary judgment motion, the Court assumes that Plaintiff's seizures were involuntary, as that interpretation is most favorable to Plaintiff (the non-movant).

[4]  Ativan is a sedative. Dr. Garcia testified that it is given to patients who exhibit seizure-like activity to "calm them down so that they don't hurt themselves."   Doc. 260-4, p. 194.

really wanted now, the Ativan…because he said 'I had this in the hospital.'"   *Id.*, p. 141-145.
Later in his deposition, Dr. Santos explained that "I have to listen to the nurses."   *Id.*, p. 154.   He
did believe, however, that Plaintiff was having mild spasms, which is why he prescribed the muscle
relaxant.   *Id.*, p. 144-45.

Dr. Garcia observed Plaintiff having seizure-like activity in July 2017, and noticed that
Plaintiff remained alert and looking directly at Dr. Garcia while his body made jerking notions,
which is atypical for seizures.   Doc. 260-4, pp. 59, 75-76.   Dr. Garcia felt that Plaintiff was in
"much pain" afterwards because of an injury sustained during the seizure-like activity.   *Id.*, p. 52,
59.   Dr. Garcia ordered Ativan for Plaintiff.   *Id.*, p. 103.   Plaintiff asked Dr. Garcia for Tramadol
(a pain medication). At his deposition, Dr. Garcia explained that a patient's request for a specific
pain medication is considered drug-seeking behavior.   *Id.*, p. 58.   Dr. Garcia ordered Tramadol
for Plaintiff, but only three doses, because he believed Plaintiff's specific request for Tramadol
was drug-seeking behavior.   *Id.*, p. 60.   Dr. Garcia noticed that Plaintiff did not behave as a
patient typically does after having a seizure; he quickly recovered without any drowsiness or
confusion.   *Id.*, p. 63.

Dr. Santos ordered Toradol for Plaintiff, which is a "strong" pain medication but "not really
part of the controlled substances."   Doc. 260-2, pp. 163-64.   The order was not indefinite, though,
and Dr. Santos attempted to transition Plaintiff to using Naprosyn.   *Id.*, p. 164.

On August 30, 2017, Nurse Sarah Elliott (not a defendant) noted that Plaintiff was sweating
and yelling loudly "Dr. Santos is gonna pay for this!"   Doc. 260-1, p. 61.   Plaintiff received a
dose of Toradol and was moved to isolation to "provide privacy/increase comfort."   *Id.*   Plaintiff
recalls an incident in which Dr. Santos grabbed and squeezed the bottom of his foot, which caused

Page **9** of **29**

Plaintiff to start convulsing.   Doc. 275-4, p. 21.   Dr. Santos then ordered Nurse Dean and Nurse Knebel to put Plaintiff into an isolation cell where no one could hear him "cry for help" and there was no emergency call switch.   *Id*.   No one checked on him until the next day; he did not have a wheelchair or urinal container, so he had to lay in his urine and feces.   *Id*.

On October 11, 2017,   a nurse noted that Plaintiff complained he was "having trouble breathing" and "full body spasms."   Doc. 260-2, p. 153-54.   The nurse told Dr. Santos, and he ordered to check Plaintiff's oxygen saturation level, which was normal.   *Id*., p. 154.   A few days later, Dr. Santos examined Plaintiff and noted that both feet were flexed and Plaintiff reported that he could not lift them up.   *Id*., p. 156; Doc. 260-1, p. 64.   However, outside of the examination, Dr. Santos observed that Plaintiff had full range of motion in both feet and noted as such in the record.   *Id*.

Dr. Santos and Dr. Garcia describe Plaintiff as "manipulative."   Doc. 260-2, p. 181; Doc. 260-4, p. 154.   Other inmates and nurses told Dr. Garcia that they saw Plaintiff standing.   Doc. 260-4, p. 155, 156.   When asked about Plaintiff's cooperation and requests for narcotic pain medication, Dr. Santos gave the following testimony:

> ….**the thing is sometimes [inmates] will just ask for something which you cannot provide or you don't want to provide because it will be deterrent to their health.   What we're trying to do is to keep them healthy and active. That's part of our job.   It's not that we are trying to refuse them the treatment they want, but we want them to be, you know, healthy.**
>
> Q: And in Mr. Armour's case, what things did he not cooperate with?
>
> A: **The things that we're telling him.   Even the nurses were telling him, do this, do that, do the exercise, it will be good for you, because there's not much in your MRI that we show that**

you are really disabled.   But he refused that.

Q: What if he was really hurting?

**A:  He was hurting, but we're giving him medication for the pain.   But the thing is we're trying to wean him off of the addictive medications, which is part of our job, to get you out of that medicine.   Because in the long run, it will hurt you more.**

Q:   What if his history showed that he was in such pain that was the only type of medication that worked for him?

**A: That's why we're trying to control that.   Because addicting medications, you keep on increasing the dose.   Increasing, increasing until he, you know, it hurts your whole being, and we are trying to avoid that.**

Q: But what if the pain is not abated by anything less strong than those things?

**A: That is different. That's different cases. Say for example, somebody who had cancer, we have lots of cancer patients in the infirmary also sometimes.   We give them all the medicine that they really need. They need, not what they want.**

Q:   Well, you saw that the emergency room person at St. Mary's gave Mr. Armour Dilaudid and thought that was appropriate; correct?

**A: If you go to the emergency room, you've got a lot of pain, they will give that to you, but they don't necessarily prescribe that. Okay? I can give you an example.   You've got severe pain, you know, you go to the emergency room. That's how they do. Relieve your pain.   But the thing is, that is only the relief, but you go back to your facility, just like in Centralia. We try to wean you off of those controlled substances.**

Doc. 260-2, p. 182-85.   Dr. Santos agreed that Plaintiff had the right to refuse treatment or recommendations, like ambulating with the gait belt.   *Id*., p. 186.   However, as part of his plan for Plaintiff's care, Dr. Santos wanted to prevent Plaintiff from engaging in drug-seeking behavior

when he was released from prison, and to "keep him healthy and ambulatory as much as possible."

*Id.*, pp. 199-200.

At his deposition, Dr. Garcia also described the issues involved in prescribing narcotic pain medication to patients with chronic pain:

> Q: If a patient had previously been on a narcotic, and they knew that narcotic helped their pain, is there a reason why you wouldn't just give the same narcotic to that patient?
>
> **A: You would want to observe and monitor the patient first before you give them that narcotic, because you don't just give them a narcotic.  You're just basically promoting them to be more addicted to the narcotic.  You want to try them first on giving them anti-inflammatories, muscle relaxant, everything, even if they say so, because you don't want them to be, again, dependent on narcotics. It's so hard to get off narcotics.  You don't want to, especially at a correctional setting.**

Doc. 260-4, pp. 46-47.   Even if a patient had already been prescribed narcotic pain medication by another physician, Dr. Garcia would, upon assuming their care, start the patient on non-narcotic pain medication and observe and monitor the patient before considering narcotic pain medication. *Id.*, p. 47.

Nurse Terri Dean recalls that Plaintiff would have "episodes" of "shaking."   Doc. 260-5, p. 16.   Nurse Dean explained that, from her perspective, "when you have a seizure, you cannot communicate through that process.   [Plaintiff] was always communicating.   He would let us know when-in the middle of his episodes-that [he was] having a seizure."   *Id.*, p. 18.[5]   Plaintiff recalls that when he would have convulsions, he would be placed back in bed "in extreme pain" and would urinate and defecate on himself.   Doc. 275-4, p. 9.

---

[5]  Nurse Dean acknowledged that as a nurse, she cannot diagnose seizures or spasms. Doc. 260-5, p. 17.

Nurse Dean also noticed that when Plaintiff sat in the wheelchair or moved around in his bed, he was able to put pressure on his feet.   Doc. 260-5, p. 27.   However, when she attempted to have him stand, he would tell her that he could not stand because he could not put pressure on his feet.   *Id*.   Plaintiff recalls that on one occasion, Nurse Dean pushed down on his shoulders to force his feet to touch the floor.   Doc. 275-4, p. 8.   Plaintiff's feet gave out and he fell backwards and hit his head.   *Id*.   He had "a full body spasm for 16 hours."   *Id*., pp. 9, 16.   Nurse Dean laughed as Plaintiff convulsed and urinated on himself.   *Id*., p. 11.

Plaintiff recalls that one evening, Nurse Shoemaker watched as another nurse pulled Plaintiff up by the gait belt to his walker even though he told them that he was in a lot of pain from having muscle spasms earlier that day.   *Id*., p. 10.   The nurses told him "you'll be ok now get out to the hallway so we can get this physical therapy done."   *Id*.   As Plaintiff stood up, "it hit a nerve again" and the walker "went sailing" and he "flo[pped] around like a fish."   *Id*.   Nurse Shoemaker recalls an incident after Plaintiff returned from the physical therapy appointment at St. Mary's where she and another nurse tried to attempt exercises with him.   Doc. 260-6, p. 42.   Plaintiff pulled his knees up to his chest and screamed that there was shooting pain in the balls of his feet, but Nurse Shoemaker thought that his feet never touched the ground.   *Id*.   She recalls that she and the other nurse placed him back in bed.   *Id*.

Plaintiff states in his affidavit that Nurse Shoemaker would "leave [him] in pain all the time."   *Id*., p. 18.   Nurse Shoemaker testified that Plaintiff refused the prescribed pain medication that she offered him, so she could not determine whether he needed stronger medicine.   Doc. 260-6, p. 28.

Defendant David Stock was the Acting Warden at Centralia from February 2018-May

2018.   Doc. 264-3, p. 24.   Plaintiff had a conversation with Warden Stock where he told him that staff members were "refusing to let us go outside…I have never been outside since I've been here." Doc. 264-1, p. 51.     Whether inmates who lived in the infirmary could go outside was also subject to the discretion of the doctor.   Doc. 264-3., p. 86.   Plaintiff testified that during the approximately two years he lived in the infirmary at Centralia, he spent no more than five hours total outside.   Doc. 264-1, p. 20.   Every day, he asked the officer in the infirmary to let him go outside.   *Id.*, p. 26.   He also asked "the nurses" because they tell the officer which offenders had a pass to go outside.   *Id.*   Other inmates in the infirmary were allowed to go outside. *Id.*, p. 19. Plaintiff testified that he "fought and fought with Santos to finally get me a pass, while everybody else got to go.   And that was from day one. And even with the pass, I was lucky if I got that half hour one day, let alone three."   *Id*, p. 26

Plaintiff also told Warden Stock about the defective shower chair.   *Id.*, p. 55.     Regarding Plaintiff's other allegations against him, Defendant Stock testified that there was a general policy regarding what time inmates in the infirmary could take showers, but there were exceptions to that policy, particularly if an inmate soiled himself.   Doc. 264-3, p. 25-27.   Defendant Stock also testified that he did not have the authority to send an inmate to the emergency room for medical treatment-that was the physician's decision.   *Id.*, p. 120-21.

Inmates were allowed to use the law library at Centralia three times a week.   *Id.*, p. 26. Defendant Zurliene and another correctional officer were assigned to assist Plaintiff to the library. *Id.*, p. 19-21, 26.   Defendant Zurliene refused to take Plaintiff.   *Id.*

On April 4, 2018, the dentist at Centralia told Plaintiff "come see me" for a tooth extraction. Doc. 264-1, p. 58.   The next day, Plaintiff's tooth was hurting "real bad" and he kept telling

Page **14** of **29**

Officer Zurliene "I need to go. This thing is hurting." *Id*.  He then "ended up in a spell" and "pushed the emergency button."  Officer Zurliene responded and said "I don't care what you need…you ain't getting s***" and locked the door.  *Id*.  Later on that day, the dentist appeared and "pulled [Plaintiff] out of the room" and pulled three of Plaintiff's teeth.  *Id*.

### Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005).  The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323.  Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).  In considering a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

### Eighth Amendment Claims

The Eighth Amendment "'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Brown v. Osmundson*, 38 F. 4th 545, 559-60 (7th Cir. 2022) (internal citations omitted).  To succeed on his deliberate indifference claims, Plaintiff must "provide

evidence, either direct or circumstantial" that shows (1) "he had an objectively serious medical need" (2) "which [the defendant] "[knew] of and disregard[ded] a substantial risk of harm." *Id.* at 550.   Negligence or even recklessness does not constitute deliberate indifference; the defendant must have shown "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Id.*

**Counts 1 and 2: Dr. Santos, Dr. Garcia, Jessica Knebel, Deana Shoemaker, Terri Dean, Beverly Habbe, and Lisa Krebs**

In an affidavit that he swore to in 2019, Plaintiff recounts an event that occurred at Centralia in 2017 in which Dr. Santos "aggressively grab[bed] and squeezed the bottom of my foot knowing the results which directly sent me into full convulsions before he could get out the door."   Then Dr. Santos ordered Jessica Knebel, Terri Dean, and a correctional officer to place him in an isolation unit with no emergency call switch, where "no one can hear my cry for help or scream in pain…no one came to check on me, they left me in there [until] the next day in extreme pain and…I was left in my own [urine and feces]" without a wheelchair or a "urinal jug."   Doc. 275-4, p. 21. Dr. Santos and Terri Dean deny this incident occurred.   Plaintiff's recollection creates a genuine issue of material fact regarding whether Dr. Santos and Terri Dean violated Plaintiff's Eighth Amendment rights on this specific occasion.[6]   Similarly, Plaintiff's recollection of Terri Dean telling him to "shut up" and pushing down on his shoulders to make his feet touch the ground (and then laughing as he convulsed and urinated on himself) also creates a genuine issue of material

---

[6] Defendant Knebel's attorney moved for summary judgment on her behalf, and Plaintiff had no objection, presumably because a Suggestion of Death was filed on her behalf more than eight months ago with no Motion for Substitute made.   Doc. 240.   Under these circumstances, the Court exercises its discretion to find that Plaintiff's lack of Response to Defendant Knebel's Motion for summary judgment is an admission of the Motion's merits.

fact as to whether she was deliberately indifferent to Plaintiff's serious medical needs.

Regarding the remainder of Plaintiff's allegations against Dr. Santos, and all of his allegations against Dr. Garcia, the record lacks evidence that Defendants had a "sufficiently culpable mental state." *Whiting v. Wexford Health Sources, Inc.,* 839 F.3d 658, 662 (7th Cir. 2016).   For purposes of ruling on Defendants' summary judgment motions, the Court views the evidence in the light most favorable to Plaintiff and assumes that his pain was excruciating and his convulsions were involuntary.   Nonetheless, the undisputed record reflects that Dr. Santos (apart from the incidents described above) and Dr. Garcia exercised professional judgment in the way they treated Plaintiff-even if their judgment was mistaken.   As the Seventh Circuit has explained,

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.   A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Zaya v. Sood*, 836 F.3d 800, 805-6 (7th Cir. 2016).

Both Dr. Santos and Dr. Garcia testified to the reasons why they did not believe opioid pain medication was appropriate for Plaintiff-they wanted to avoid causing him to become addicted to pain medication and they wanted him to avoid drug-seeking behavior, which would be problematic for him, *inter alia*, upon release from prison.   Both doctors explained why, in their view, Plaintiff appeared to be exhibiting drug-seeking behavior: he made requests for specific drugs, he had no sensory or motor deficits upon arriving at Centralia but soon stopped ambulating or even attempting to ambulate, and his MRI showed no impingement of the sciatic nerve.

Page **17** of **29**

Nothing in the record contradicts their explanations for what they "honestly believe[d]"- that opioid pain medication would be harmful to Plaintiff.   *See id*.   Plaintiff testified that he truly could not ambulate because his pain was so intense, and testified that he never exaggerated having spasms, but this testimony merely indicates that, at most, Drs. Santos and Garcia were mistaken when they believed that Plaintiff was exhibiting drug-seeking behavior.

The Court acknowledges that a physician's "persistence in a course of treatment known to be ineffective" is evidence of the physician's culpability, and reason (in many cases) to proceed to trial.   *Petties v. Carter*,   836 F.3d 722, 729-30 (7th Cir. 2016) (internal citations omitted). Though Plaintiff maintains that the over-the-counter medications, Toradol, and muscle relaxants prescribed to him were not effective, the undisputed evidence nonetheless reflects that Drs. Garcia and Santos were not disregarding a substantial risk of serious harm to Plaintiff.   To the contrary, Dr. Santos' testimony reflects the serious risk of harm posed by prescribing opioids to Plaintiff: Plaintiff is then released from prison addicted to opioids, and/or motivated to persist with drug-seeking behavior.   Pain is subjective, and Drs. Garcia and Santos explained their objective reasoning for refusing to prescribe opioid medication to Plaintiff.

Plaintiff compares this case to another case before the undersigned in which Dr. Santos' motion for summary judgment was denied.   *Wilson v. Santos*, Case No. 18-cv-1484-RJD, Doc. No. 152, (Sept. 2, 2021).   In *Wilson*, the inmate's pain was acute and there was objective evidence (the presence of a mesh implant in his abdomen) to explain why he was in significant pain.   *Id*., pp.   2-6.   A surgeon removed the mesh implant and prescribed Tramadol to the inmate to take as needed post-surgery for pain; Dr. Santos overrode that order and prescribed ibuprofen instead to the inmate.   *Id*., p. 7.   Dr. Santos did not offer testimony that reflected the inmate was exhibiting

drug seeking behavior.   *Id*., p. 8.   In that scenario, a jury could find that Dr. Santos disregarded a substantial risk of serious harm to the inmate.   *Id*.

Here, however, Plaintiff's pain was chronic.   On one occasion, Dr. Garcia prescribed a limited amount of Tramadol to Plaintiff to address acute pain from an injury sustained during seizure-like activity.   Undisputed testimony by Dr. Santos and Dr. Garcia reflects that they believed (and why they believed) that Plaintiff was exhibiting drug-seeking behavior.

Plaintiff also contends that Dr. Santos or Dr. Garcia should have sent him to a specialist. Both doctors have provided reasonable, undisputed explanations for why they did not do so.   Dr. Garcia explained Plaintiff's seizure-like activity appeared to be voluntary.   Plaintiff remained alert as he was having spasms and looked directly at Dr. Garcia.   He was also alert immediately after the spasms stopped and was able to recall the spasms.   Plaintiff testified that his seizures were involuntary, but this testimony merely indicates that Dr. Garcia was wrong in his assessment of Plaintiff's spasms.

As for Dr. Santos, he referred Plaintiff to an outside provider for physical therapy.   Upon learning that Plaintiff would not attempt to comply with the exam (and understanding that Plaintiff maintained he *could* not comply with the exam), Dr. Santos did not send Plaintiff for further referrals because he believed Plaintiff was not accurately reporting and exhibiting his symptoms. Plaintiff contends that his contracted feet kept him from complying, but Dr. Santos explained that contracture results from non-use, and ordered muscle relaxants to address the contracture.   Dr. Santos also relied on reports by other healthcare providers regarding the nature of Plaintiff's spasms, and had warned Plaintiff that refusing to ambulate would cause ambulation to be more difficult.   Viewing this evidence in the light most favorable to Plaintiff suggests-once again-that

Dr. Santos was merely mistaken when he determined Plaintiff refused to cooperate with the physical therapy exam.

Accordingly, summary judgment is warranted in favor of Dr. Garcia.[7]   Regarding Dr. Santos, there remains a genuine issue of material fact regarding whether Dr. Santos violated Plaintiff's Eighth Amendment rights by ordering nurses to put Plaintiff in an isolation room for 24 hours with no means to alert healthcare staff, and to lay in his own urine and feces.

As for Nurses Dean, Shoemaker, and Habbe, Plaintiff argues that they violated his Eighth Amendment rights by forcing him to do physical therapy exercises.   The record reflects that the "physical therapy" to which Plaintiff refers was simply walking with him, utilizing a walker and gait belt.   While the undisputed evidence shows that multiple nurses attempted to have Plaintiff walk, the only evidence in the record of a Defendant nurse actually forcing him to walk is the incident described in Plaintiff's affidavit in which Nurse Dean forced his shoulders down so that his feet would hit the floor.

Plaintiff described a specific event with Nurse Shoemaker in which she and/or a fellow nurse told him "you'll be ok now get out to the hallway so we can get this physical therapy done." The fellow nurse then placed a gait belt on Plaintiff and somehow he was "pulled up to the walker by the gait belt", causing his feet to hit the floor and excruciating pain and he fell to the floor.

---

[7] Plaintiff retained a chiropractor to testify as an expert in this case.   The Wexford Defendants filed a *Daubert* motion to exclude the chiropractor's opinions.   Docs. 261 and 262.   The Court will address this motion in a subsequent order. However, even if admissible, the chiropractor's opinions merely support a finding that Dr. Santos and Dr. Garcia made a mistake by concluding that Plaintiff was exhibiting drug-seeking behavior, exaggerating his spasms, and needed to ambulate. "Mere medical malpractice or a disagreement with a doctor's medical judgment is not deliberate indifference." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (internal citations omitted).   As previously explained, for the purpose of ruling on Defendants' summary judgment motion the Court presumes that Plaintiff was not exhibiting drug-seeking behavior, exaggerating his spasms, and assumes that he could not ambulate.

That one or both of the nurses told him that he would be "ok" and pulled on his belt does not, without additional evidence, suggest that either nurse was forcing him to walk or otherwise deliberately indifferent; at best, one or both was negligent.   This incident differs from the incident described by Plaintiff regarding Nurse Dean in which the Court could infer she was forcing him to walk even though he was in pain, according to Plaintiff's recollection of the event.

Plaintiff then argues that the defendant nurses should have advocated for him to receive stronger pain medication or a referral to a specialist.   Clearly, it is the doctors' decision to give Plaintiff narcotic pain medication or order that Plaintiff be sent to a specialist, not the nurses. Nothing in the record suggests that the nurses withheld pertinent information from the doctors that would have caused them to reconsider Plaintiff's treatment. To the contrary, Plaintiff's medical records are replete with notes by various nurses regarding Plaintiff's spasms, refusal to ambulate, and requests for stronger pain medication.

The Court also notes that Plaintiff testified he was placed in bed on multiple occasions, and left to urinate and defecate on himself.   While this testimony suggests an Eighth Amendment violation, Plaintiff does not identify any particular defendant nurse (apart from Nurse Kneleb or Nurse Dean) who left him to urinate or defecate on himself.

For the reasons described above, decisions by Dr. Santos and Dr. Garcia regarding Plaintiff's treatment were based on their undisputed professional judgment.   That the nurses did not question their treatment or recommend to the doctors something different for Plaintiff undisputedly reflects their professional judgment.   Nurse Habbe described why Plaintiff's seizure in front of Dr. Caldwell appeared to be voluntary.   Nurse Dean explained that she saw Plaintiff put pressure down on his feet while he was in bed.   Nurse Shoemaker testified that Plaintiff

Page **21** of **29**

refused the prescribed medications that she offered him, so she could not determine whether he needed stronger pain medications.    Consequently, summary judgment is appropriate in favor of Nurses Habbe and Shoemaker.    Summary judgment regarding Nurse Dean is denied only regarding the incident in which Plaintiff claims she left him lying in urine and feces with no way of calling for help in isolation for 24 hours, and the incident in which he describes her pushing his shoulders down to force him to walk.

Finally, Lisa Krebs was the health care unit administrator at Centralia.    The record reflects that she communicated with Plaintiff regarding his complaints, and also responded to a grievance. She did not provide him health care.   Administrators are entitled to "defer to the judgment of [prison] health professionals so long as [they] do not ignore the inmate's complaints." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2003).   Prison officials may be liable for violations of the Eighth Amendment if they "obtain actual knowledge of [the inmate's] objectively serious medical condition and inadequate medical care."   *Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2016). The record reflects that Ms. Krebs, upon learning of Plaintiff's complaints, reviewed his medical records to make sure he was receiving sufficient health care.   As explained above, the only evidence of healthcare staff acting with deliberate indifference to Plaintiff's serious medical needs are two incidents, neither of which are described in the medical records the way Plaintiff describes in his affidavit.

Plaintiff told Lisa Krebs that the shower chair in the infirmary was defective in December 2016, and subsequently fell twice from the shower chair.   However, when Lisa Krebs inspected the chair after Plaintiff fell, she saw no defects.   As healthcare unit administrator, she also inspected the chair periodically before Plaintiff informed her of the defect.   While her testimony

conflicts with Plaintiff's affidavit regarding whether there was a defect in the shower chair, this conflict does not create a genuine issue of material fact.   Ms. Krebs' failure to identify a defect in the shower chair before or after Plaintiff fell is, at most, negligence.

The record reflects that Ms. Krebs considered Plaintiff's request to order his own wheelchair with a "removable arm" in December 2016.   Doc. 276-7, p. 4.   In her written response to Plaintiff's request, she noted that this was "discouraged."   *Id*. p. 2.   She explained at her deposition that inmates were not normally allowed to order their own wheelchairs, for security and safety reasons.   Doc. 264-2, p. 33.   Moreover, Ms. Krebs reviewed Plaintiff's medical records and noted that Dr. Santos recommended that Plaintiff exercise and walk, but Plaintiff was refusing to ambulate.   Because Plaintiff fails to present evidence that indicates Ms. Krebs was aware that Plaintiff was receiving inadequate medical care, summary judgment is therefore appropriate in her favor.

**Count 5: David Stock[8]**

Defendant Stock was the Warden at Centralia from February 2018-May 2018.   He recalls multiple conversations with Plaintiff regarding Plaintiff's complaints about medical care. Defendant Stock spoke with the healthcare administrator at that time, Lana Nalejawka. Defendant Stock also spoke with Dr. Santos regarding specific inmates' medical care, but he does not have recall what he discussed with Dr. Santos regarding Plaintiff.   In any event, Defendant Stock cannot be liable for violating Plaintiff's Eighth Amendment rights unless he had actual

---

[8] Count 5 is also pending against Robert Mueller.   Counsel for Defendant Mueller filed a Suggestion of Death on January 11, 2023.   No Motion for Substitution has been filed.   Counsel for Defendant Mueller did not move for summary judgment on his behalf.

knowledge that Plaintiff was receiving inadequate medical care for an objectively serious condition.   *Id.*   While the record reflects that Defendant Stock was aware of Plaintiff's complaints (the same complaints that, for the most part, do not create a genuine issue of material fact in Claims 1 and 2),   no evidence suggests that Plaintiff was receiving constitutionally deficient medical care in 2018 of which Defendant Stock was aware.

Plaintiff also argues that Defendant Stock implemented a policy that Plaintiff and other inmates could only shower during certain hours of the day, which caused him to "sit in his own excrement."   Plaintiff fails to point the Court to any evidence that supports this argument. Defendant Stock was only the warden for the final four of Plaintiff's 22 months at Centralia.   He testified that when he became Warden, he made no changes to an existing policy that inmates in the infirmary could only shower during certain hours of the day, but there were exceptions to that rule, including when an inmate soiled himself.   No admissible evidence contradicts this testimony. To the extent Plaintiff was forced to sit in his own excrement, no reasonable juror could attribute that issue to Defendant Stock.   Consequently, summary judgment is appropriate in favor of Defendant Stock.

**Count Six: Jason Zurliene**

A brief delay in treatment may constitute deliberate indifference if the delay "unncecessarily prolong[s] the inmate's pain."   *Perez*, 792 F.3d at 777-78.   Plaintiff needed some of his teeth pulled on April 5, 2018.   When he told Officer Zurliene that he needed to go see the dentist, Officer Zurliene refused and "locked the door."   Doc. 264-1, p. 58.   Later that day, the dentist appeared and pulled Plaintiff's teeth.   *Id.*

Regarding Plaintiff's testimony that Officer Zurliene "locked the door", there is no

Page **24** of **29**

evidence to suggest that Officer Zurliene (a correctional officer charged with inmate safety and security) prevented Plaintiff from seeing the dentist sooner by locking the door.   Moreover, nothing in the record reflects that Officer Zurliene could have arranged for Plaintiff to see the dentist.   Officer Zurliene testified that when an inmate needs a tooth pulled, he must fill out a request slip.   Doc. 264-4, p. 99.   Officer Zurliene could not arrange for an inmate to see the dentist.   *Id*., p. 101.   Had Plaintiff been experiencing a medical emergency, Officer Zurliene could have contacted a nurse or doctor, but a request to see a dentist for a toothache was not considered a medical emergency requiring officer intervention.   *Id*., p. 21, 99.   Plaintiff points to no evidence that contradicts Officer Zurliene's testimony. Thus, there is no genuine issue of material fact regarding whether Officer Zurliene "unnecessarily prolonged" Plaintiff's pain and summary judgment is appropriate in favor of Officer Zurliene.


### ADA/RA

The ADA and RA both protect individuals with disabilities from discrimination; the two statutes are "materially identical."   *A.H. by Holzmuller v. Illinois High School Ass'n*, 881 F.3d 587, 591 (7th Cir. 2018).   To succeed on this claim, Plaintiff must establish the following: (1) "he is a 'qualified individual with a disability'"; (2) "that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subject to discrimination by such an entity"; and (3) "that the denial or discrimination was 'by reason of his disability.'"   *Wagoner v. Lemon*, 778 F.3d 586, 592 (7th Cir. 2015) (internal citations and quotations omitted).

In her summary judgment motion, Defendant Hughes[9] does not contend that Plaintiff was not disabled within the meaning of the ADA and RA; instead, she contends that the undisputed evidence reflects that Plaintiff was not denied the benefits of the services, programs, or activities (hereinafter, "programs") at Centralia. A "program" is "anything a prison does" and includes "all of the operations of a prison." *Shaw v. Kemper*, 52 F. 4th 331, 334 (7th Cir. 2021).    Plaintiff argued that he was denied access to the law library, showers, and outside.    To survive summary judgment, Plaintiff must point to evidence that indicates he was "denied all access" to these programs, or that his access was severely limited. *Wagoner*, 778 F.3d at 593 (*quoting Love v. Westville Correctional Ctr.*, 778 F.3d 586, 560 (7th Cir. 1996)).

Plaintiff fails to identify any evidence that indicates he was denied all access to the showers, or that his showers were severely limited.   He testified that the shower chair was defective, and that he fell from it twice.   Still, the evidence otherwise reflects that he had access to showers, even if it was only during certain hours-a restriction that generally applied to all inmates in the infirmary, regardless of disability.

Plaintiff testified that his "disability" prevented him from accessing the law library, but when asked to explain how, he simply stated that it was because Officer Zurliene refused to take him to the library.   Doc. 264-1, pp. 24-25 ("if Zurliene was working, I wasn't getting nothing." No evidence reflects that the reason Officer Zurliene refused to take Plaintiff to the law library was because of his disability.   Even if he had, noticeably absent from the record is evidence to reflect that Plaintiff was denied all access to the law library, or that his access was severely limited.

---

[9] Latoya Hughes is the Acting Director of the IDOC and pursuant to Federal Rule of Civil Procedure 25(d) is automatically substituted for Rob Jeffreys.   The Clerk of Court is directed to update the docket accordingly.

Plaintiff testified that he asked to go outside every day that inmates in the infirmary were allowed outside, but over the course of two years he was only allowed outside for a total of five hours (at no more than 30 minutes per session).   Doc. 264-1, p. 19.   This testimony creates an issue of fact regarding whether Plaintiff's access to the outside was severely limited.   Thus, the Court consider whether Plaintiff's severely limited access to the outside was "by reason" of his disability.   David Stock and Lisa Krebs testified that because Plaintiff was a patient in the infirmary, it was Dr. Santos' decision to "allow" (or not allow) Plaintiff outside.   Doc. 264-3, p. 86;   Doc. 260-4, p. 70.   Plaintiff testified that at some point, Dr. Santos gave him a pass, but Plaintiff still was not allowed to go outside.   Doc. 264-1, p. 26.   There is no evidence in the record to explain why, after Dr. Santos gave Plaintiff a pass, he was still not allowed outside.   If the Court assumes that once Dr. Santos gave Plaintiff the pass, a different IDOC or Wexford staff member prohibited Plaintiff from going outside, the Court could only speculate why that prohibition occurred.

If the Court assumes that it was Dr. Santos (and no one else) who was responsible for severely limiting Plaintiff's access to the outside, the record contains no admissible evidence to suggest that Dr. Santos did so because of Plaintiff's disability.[10]   After all, Plaintiff testified that the other inmates in the infirmary were allowed outside, despite chronic conditions like seizures, or Lou Gehrig's disease.   The record before the Court reflects that no one ever asked Dr. Santos why he kept Plaintiff from going outside, and there is no evidence from which the Court can infer

---

[10]  Lisa Krebs testified that her response to Plaintiff's grievance indicates that Dr. Santos thought Plaintiff "was not stable enough to go outside."   Doc. 264-2, p. 73.   This statement appears to be hearsay not subject to any exception, and Lisa Krebs them immediately clarified that she was "guessing" and "shouldn't speak for Dr. Santos." *Id*.

that he did so because of Plaintiff's disability.    To the contrary, the evidence reflects that Dr. Santos did not think Plaintiff was having seizures, or was unable to ambulate.

Finally, Plaintiff argues that he was "denied adequate medical equipment."   He contends that the wheelchair and shower chair were defective.   Complaints about the conditions of assistive devices are not actionable under the ADA/RA unless those conditions caused the claimant to be denied access "to any services or programs."   *Wagoner*, 778 F.3d at 592-93.   Similar to this case, the inmate in *Wagoner* complained that the IDOC failed to repair his wheelchair, but provided no evidence that the defective wheelchair kept him from accessing (or severely limited his access to) some programs or activities.   Here, the evidence reflects that to the extent Plaintiff was denied access to the outside or law library, it was not because the wheelchair was defective.   It was because a staff member (e.g., Officer Zurliene) arbitrarily refused to transport Plaintiff or permit him access.   Likewise, there is no evidence that Plaintiff took fewer showers because of the defective shower chair.

In sum, there is no genuine issue of material fact regarding whether Plaintiff was denied access to programs at Centralia because of his disability.   Defendant Hughes is therefore entitled to summary judgment on Plaintiff's ADA/RA claim.

## <u>Conclusion</u>

Summary judgment is granted in favor of Defendants Garcia, Knebel, Habbe, Shoemaker, and Krebs on Counts I and II.   Summary judgment is granted in favor of Latoya Hughes in Count IV. Summary judgment is granted in favor of Defendant Stock on Count V and in favor of Defendant Zurliene on Count VI.   This case proceeds to trial against Defendants Santos and Dean for the specific incident in which Plaintiff testified that Dr. Santos grabbed and squeezed his foot

aggressively, then told Nurse Dean and Nurse Knebel to put Plaintiff into an isolation cell where no one could hear him "cry for help" and there was no emergency call switch.   This case also proceeds to trial against Nurse Dean for the specific incident in which Plaintiff testified that she forced his shoulders down so that his feet would touch the floor.   Plaintiff's claims against Defendants Garcia, Kneleb, Habbe, Shoemaker, Hughes, Krebs, Stock, and Zurliene are DISMISSED WITH PREJUDICE.   The Court is directed to enter judgment accordingly at the close of the case.

Defense counsel filed a Suggestion of Death regarding Robert Mueller more than ten months ago, and no Motion for Substitution was ever filed.   Accordingly, Plaintiff is ORDERED TO SHOW CAUSE on or before November 3, 2023 why his claim against Defendant Mueller should not be dismissed with prejudice.

**IT IS SO ORDERED.**

**DATED: October 26, 2023**

_s/_ _Reona J. Daly_
**Hon. Reona J. Daly**
**United States Magistrate Judge**